## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**SHAWN DREW,**

     **Petitioner,**

**v.**

**WANZA JACKSON, WARDEN**
**WARREN CORRECTIONAL**
**INSTITUTION,**

     **Respondent.**

**CASE NO. 2:10-cv-301**

**JUDGE WATSON**
**MAGISTRATE JUDGE KEMP**

### REPORT AND RECOMMENDATION

Petitioner, a state prisoner, has filed the instant motion to vacate, set aside, or correct sentence pursuant to 28 U.S.C. §2254.  This matter is before the Court on the instant petition, respondent's return of writ, petitioner's reply, and the exhibits of the parties.   For the reasons that follow, the Magistrate Judge **RECOMMENDS** that  petitioner's claims be **DISMISSED.**   Further, petitioner's motion for an order to include recordings will be denied.

Turning briefly to petitioner's motion seeking recordings of the alleged victim, the Court construes this motion as a request for discovery.  According to petitioner, these recordings are necessary "for the Court to be able to compare the alleged victim's in-court statements with the statements she originally gave to law enforcement operatives which are certainly inconsistent and actually amount to perjury."   Respondent has opposed the request on various grounds including that petitioner has not demonstrated what these recordings will enable him to prove.

The discovery processes contained in the Federal Rules of Civil Procedure do not apply across the board in habeas corpus actions. "A habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course." *Bracy v. Gramley*, 520 U.S. 899, 904, 117 S.Ct. 1793, 138 L.Ed.2d 97 (1997). In *Harris v. Nelson*, 394 U.S. 286, 295, 89 S.Ct. 1082, 22 L.Ed.2d 281 (1969), the United States Supreme Court held that the "broad discovery provisions" of the Federal Rules of Civil Procedure did not apply in habeas corpus proceedings. As a result of the holding in *Harris*, the Rules Governing Section 2254 Cases in the United States District Courts were promulgated in 1976.

Specifically, Rule 6(a) provides-

> A party shall be entitled to invoke the processes of discovery available under the Federal Rules of Civil Procedure if, and to the extent that, the judge in the exercise of his discretion and for good cause shown grants leave to do so, but not otherwise.

Under this "good cause" standard, a district court should grant leave to conduct discovery in habeas corpus proceedings only " 'where specific allegations before the court show reason to believe that the petitioner may, if the facts are more fully developed, be able to demonstrate that he is ... entitled to relief....' " *Bracy*, 520 U.S. at 908-909 (quoting *Harris*, 394 U.S. at 300). *See also Stanford v. Parker*, 266 F.3d 442, 460 (6th Cir.2001), *rehearing en banc denied*, Nov. 29, 2001.

> "The burden of demonstrating the materiality of the information requested is on the moving party." *Stanford*, 266 F.3d at 460. Rule 6 does not "sanction fishing expeditions based on a petitioner's conclusory allegations." *Rector v. Johnson*, 120 F.3d 551, 562 (5th Cir.1997); *see also Stanford*, 266 F.3d at 460. "Conclusory allegations are not enough to warrant discovery under [Rule 6]; the petitioner must set forth specific allegations of fact ." *Ward v. Whitley*, 21 F.3d 1355, 1367 (5th Cir.1994).

2

Petitioner has failed to meet this standard here.  For the reasons discussed, below, his claims are procedurally defaulted or plainly lack merit.  Consequently, petitioner's motion, construed as a request for discovery, Doc. No. 17,  is DENIED.

Similarly, petitioner's request for an extension of time to file a reply to respondent's return of writ, contained in his reply in support of his motion, is also denied.  Petitioner already has been granted one untimely request to file a reply.  Further, it appears that the purpose of the requested extension was to allow petitioner to use the information from the recordings in his reply.  Because the Court has denied petitioner's request for the recordings, he has not set forth good cause for any further untimely extensions of time for filing a reply.

## FACTS and PROCEDURAL HISTORY

The Tenth District Court of Appeals summarized the facts of this case as follows:

> {¶2The following is a recitation of the facts relative to appellant's convictions, which were adduced at trial. Additional facts will be discussed as they concern each assignment of error. Appellant and the victim, A.S., dated during high school in the late 1980's. After high school, the couple lost touch until October 2005, when A.S. contacted appellant. They met again in person in November, and by December, the two began dating. In January 2006, A.S. discovered that she was pregnant, which was a cause of concern because she suffered from a blood disorder that would cause her pregnancy to be high-risk. Additionally, A.S. was a parochial school teacher and was unsure if her status as an unwed mother would jeopardize her employment.

> {¶ 3} The couple's harmonious reunion was short lived. Appellant became violent with A.S. over the Martin Luther King holiday weekend; he "bit [her on her] face," leaving teeth marks and breaking the skin on her left cheek." (Tr. at 82.) Appellant was apologetic afterwards, but when A.S. indicated that she was not going to accept his apology, he "became even more enraged and told [A.S.] that he

3

was going to scar [her] for life and that [she] better never tell anyone." *Id.* at 83. He also became "suddenly suspicious" and jealous. *Id.* at 84. His anger became "increasingly more unpredictable" and "would say and do" things that seemed "out of character" and "odd." *Id.* at 84. He threatened to hurt A.S., as well as members of her family, and told her that if she tried to keep him out of their baby's life, he would hurt both her and the baby.

{¶ 4} Appellant's grandmother died in late January 2006. Because of the situation created by appellant's violence, A.S. did not think she should attend the funeral. Appellant called A.S. and told her that he needed to retrieve his shoes from her apartment, and instructed A.S. to meet him at his aunt's house, where she was to wait for his call. A.S. did as he said, but after waiting for over an hour without a call from appellant, she left and went to her twin sister's house to celebrate their birthday. Later that evening, appellant called A.S. and told her to come pick him up, which she did. Appellant was upset, and, while en route to A.S.'s apartment, he expressed his "displeasure" with her over her decision not to attend his grandmother's funeral. *Id.* Once at the apartment, appellant became physically violent. He began "yelling, telling [her] he was going to kill [her]." *Id.* at 99. He went into the kitchen, retrieved a knife, and threatened her with it, describing in detail how he was "going to gut" her. *Id* . During this episode, appellant hit her, pulled her hair, and, all the while, kept repeating that he would kill her. Appellant reiterated that if A.S. had any intention of not letting him have contact with the baby, then "he would hurt the baby, and [she] wouldn't have the baby at all." *Id.* at 100. The situation finally de-escalated when appellant fell asleep. A.S. did not call the police because she was afraid. She explained at trial that she "had seen him evolve into this person that was very aggressive and very intimidating and he was so descriptive" in his threats that A.S. "absolutely believed" that appellant would follow through. *Id.* at 104.

4

{¶ 5} A.S. remained in the relationship out of fear, nor did she know how to safely extricate herself. Around mid-February, appellant accompanied her to an obstetric appointment, after which, she dropped appellant off somewhere and proceeded to work. Late that evening, appellant called A.S. and was very upset. He told her to pick him up, which she did. In the car, he told her that she needed to withdraw money from her account because "someone accused him of stealing money," and even though he denied having done so, he needed to replace the money because "this person knew where his

family lived and they would hurt his family." *Id.* at 112. After trying several ATMs, and waiting for A.S.'s paycheck to appear in her account, A.S. was able to withdraw money for appellant. By that time, it was early morning, so A.S. went to work.

{¶ 6} After work, A.S. went to her sister's house to baby-sit. Having not gotten any sleep the night before, and tired from her pregnancy, A.S. fell asleep at her sister's house. In the morning, when she plugged in her cell phone to recharge in the car, her phone immediately rang-it was appellant. He told her that he needed a ride and instructed her to pick him up. Appellant was angry when he got in the car, and directed A.S. to take him back to her apartment.

{¶ 7} Once in the apartment, appellant locked the door and began yelling at A.S. She testified that his speech was incoherent and he "wasn't making any sense." *Id.* at 125. He told her to go to her bedroom, where he forced her to perform oral sex. While doing so, appellant hit A.S. about the face, and, at some point, told her that "he had seen someone who had a hamburger, and based on the toppings on this hamburger," he knew that A.S. had cheated on him. *Id.* at 127. In an attempt to get appellant to stop, A.S. told appellant that she had a parent/teacher conference at school, so she had to go, but he would not let her leave. Appellant continued to hit A.S. about her head, causing her to bleed. He then made her call into work and explain that she could not attend the conference. After she made the call, appellant went in to the kitchen, retrieved a knife, and threatened to kill A.S. with it. He also told her that he was going to "check [her] to see if [she] had been unfaithful." *Id.* at 131. Appellant then inserted his fingers into A.S.'s rectum, and, while doing so, continued to rant and rave. The situation eventually de-escalated when appellant fell asleep. When he awoke, appellant refused to talk about what had transpired and demanded that A.S. take him home.

{¶ 8} The next day, appellant called A.S. and directed her to pick him up. Once in the car, appellant told A.S. to take him to her apartment. A.S. complied with appellant's directive because she was "afraid that if [she] didn't that he would murder [her]." *Id.* at 140. While at her apartment, appellant again forced A.S. to perform oral sex on him, and, like the day before, hit her about the head. A.S. testified that appellant hit her with such force that she fell down and "everything [went] black." *Id.* at 144. When she came to, her right ear hurt "really bad" and she could not hear out of it. *Id.* at 145. When A.S. told

appellant that she could not hear, he proceeded to anally rape her. A.S. testified that while appellant was raping her, he said, "you don't think I'm going to let you do something with somebody else that you haven't done with me," which, A.S. explained at trial, she "realized at that point what he was suspicious of [her] doing all along was what he was doing to [her]." *Id.* at 147.

{¶ 9} A.S. told appellant that her roommate would be coming home soon, which brought that incident to an end. Appellant then had A.S. drive him to a restaurant parking lot, and, while sitting in the car in the parking lot, A.S. told appellant that she needed to go to the hospital to get her ear checked out. Appellant told A.S. that she needed to calm down. He then became angry, and threatened to "scar [her] for [life]" because he did not want to have his plans for that day disrupted with a detour to the hospital. *Id.* at 150. Later on, A.S. finally was able to go to the emergency room, where she was diagnosed with a perforated eardrum.

{¶ 10} A.S. testified that she disclosed to a friend and a cousin some of what had been transpiring with appellant. Her cousin helped her put together a bag of items that A.S. could take with her on a moment's notice in case she needed to leave.

{¶ 11} A.S. saw appellant after the incident involving the anal rape. Appellant called A.S. to pick him up, which she did, and testified that she complied with his demand out of fear. Appellant wanted to go back to A.S.'s apartment, but A.S. told appellant that they could not go there because her sister and her family were over using her computer. Appellant then directed A.S. to drop him off, and instructed her to call him when her sister left. For the remainder of that evening, appellant incessantly called A.S. on her cell phone; his pattern was to call, hang up, and call back again, which he did "over and over." *Id.* at 159.

{¶ 12} A.S. saw appellant for the last time when she picked him up and took him to a pre-existing doctor's appointment. She testified that she did so because she felt like she was "buying time." *Id.* A.S. went to work following appellant's doctor's appointment, after which, she went to her apartment, gathered some clothes, and stayed at a friend's house. A.S. testified that, over the course of the evening, appellant called her "hundreds of times." *Id.* at 162.

6

{¶ 13} The following day, A.S. went to the City Prosecutor's office to see about filing charges relating to the physical assault. A.S. did not disclose the sexual assaults because she was afraid, reasoning that because her friends and family had seen the physical "marks" on her, then if appellant took retribution for her going to the police, then "possibly it wouldn't be as bad as if [she] told everything." *Id*. at 163-164.

{¶ 14} Within the week, Detective David Phillips ("Detective Phillips"), an 11-year veteran with the Columbus Police Department, contacted A.S. and arranged an interview. Detective Phillips met with A.S. for over two hours, during which she appeared "distraught, upset, scared." *Id*. at 385. A.S. told Detective Phillips about the physical abuse, and, although she did not disclose the details of the sexual abuse, she mentioned that appellant had abused her in that manner as well. According to Detective Phillips, A.S. did not describe the nature of the sexual abuse because "she said she was afraid." *Id*. at 386.

{¶ 15} After meeting with A.S., Detective Phillips interviewed appellant, who denied the allegations. Appellant told Detective Phillips that A.S. was on drugs and further asserted that she was using her friend, a police officer with whom appellant stated A.S. was romantically involved with, to create trouble for him. Appellant also told Detective Phillips that A.S. had engaged in what he called "sexcapades," a term appellant used to describe A.S.'s alleged sexual promiscuity with various individuals (all crack users) from his neighborhood. *Id*. at 396-397. Specifically, he accused her of engaging in anal sex with a variety of individuals, and, when discussing the details with Detective Phillips, appellant became upset and agitated. Appellant provided the names and addresses of some of the individuals with whom A.S. was allegedly consorting, as well as various locations (crack houses and hotels) where A.S. had allegedly been using drugs. He implored Detective Phillips to follow up with the individuals he had identified, test A.S. for drugs, and check her bank account for suspicious withdrawals, because, according to appellant, the results of those investigations would exonerate him. *Id*. at 397, 410.

{¶ 16} After appellant's interview, Detective Phillips, did, in fact, look into the accusations appellant made about A.S., none of which, however, were borne out by his investigation. The individuals

7

identified by appellant, and with whom Detective Phillips spoke, did not confirm knowing A.S. When Detective Phillips spoke with A.S. herself, she denied ever having used drugs, and agreed to provide a sample of her hair for testing. The results were negative. *Id*. at 259.

{¶ 17} Detective Phillips interviewed appellant a second time. He denied having sexually assaulted A.S., and reiterated his beliefs that A.S. was a drug user and she was using her police officer friend to harass him. And, as in appellant's first interview, he frequently accused A.S. of engaging in anal sex with others, and became particularly agitated during those parts of the interview.

*State v. Drew,* 2008 WL 2349649 (10th Dist. June 10, 2008).

On March 30, 2006, a Franklin County Grand Jury indicted petitioner on four counts of rape, two counts of abduction, and one count of felonious assault. *Exhibit 1 to Return of Writ.* Before trial, petitioner, through counsel, filed a motion to suppress all statements made to any law enforcement officer. *Exhibit 3 to Return of Writ*. The trial court denied petitioner's motion by entry dated April 24, 2007. *Exhibit 4 to Return of Writ*.

On April 24, 2007, a jury returned a verdict finding petitioner guilty on all seven counts. *Exhibit 5 to Return of Writ*. On May 8, 2007, petitioner was sentenced to fifty-eight years in prison. *Exhibit 6 to Return of Writ*.

On June 4, 2007, petitioner, through counsel, filed a notice of appeal to the Franklin County Court of Appeals.   He raised the following assignments of error:

ASSIGNMENT OF ERROR NUMBER ONE

The trial court erred when it allowed the State to present the following inadmissible evidence 1) evidence impeaching the defendant on an inadmissible collateral matter and using it to show that it had scientific evidence proving the defendant was lying and the complainant was telling the truth, 2) other unrelated

8

bad act evidence used to show that the defendant was a thief and associated with violent and dangerous people, 3) improper character evidence used to show that the defendant was mentally unbalanced and paranoid and therefore more likely to have committed the crimes, 4) opinion evidence from the investigating detective that the complainant was telling the truth and the defendant was lying (Tr. 112, 116, 410-411, 415, 419, 459, 462, 512, 550, 558-561)

ASSIGNMENT OF ERROR NUMBER TWO

The defendant was denied the right to effective assistance of counsel due to the failures of counsel to properly object to patently inadmissible evidence which resulted in an extremely unfair trial (Tr. 112, 116, 410-411, 415, 459, 462, 512, 550, 558-561)

ASSIGNMENT OF ERROR NUMBER THREE

The trial court erred when it allowed the Executive Director of Choices to testify as an expert witness on domestic violence, over strenuous objection by the defendant, when the witness had no personal knowledge of any facts of the case and when her testimony was not at all relevant and was merely designed to portray batters (sic) as dangerous and violent individuals who must be stopped to keep them from killing or harming victims and the families, friends, and pets of the victims (Tr. 350-361, 469-480, 483-531)

ASSIGNMENT OF ERROR NUMBER FOUR

The trial court erred when it entered judgment against the defendant on the charge of felonious assault when the evidence was insufficient to sustain the conviction and the conviction was against the manifest weight of the evidence when the state failed to prove that the defendant knowingly caused serious physical harm to another (Tr. 178-187)

ASSIGNMENT OF ERROR NUMBER FIVE

The trial court erred in imposing consecutive sentences
because the only statutory authority for imposing
consecutive terms was held to be unconstitutional
in State v. Foster (2006), 109 Ohio St. 3d 1 (Judgment
entry, Tr. 644-645)

ASSIGNMENT OF ERROR NUMBER SIX

The trial court erred when it overruled the defendant's
motion to suppress the statements of the defendant
when the State failed to establish that the statements
were made knowingly and voluntarily and when the
statements were made in violation of the defendant's
Miranda rights and his right to counsel (Tr. 42)

*Exhibit 8 to Return of Writ.*

On June 10, 2008, the Court of Appeals issued a decision affirming the judgment of

the trial court. *Exhibit 10 to Return of Writ.*

On July 25, 2008, petitioner, still represented by counsel, filed a timely appeal to the

Ohio Supreme Court. *Exhibit 11 to Return of Writ.* He asserted the following propositions

of law:

PROPOSITION OF LAW NUMBER ONE

It is improper to allow a party to call an expert
witness, who has no personal knowledge about
any relevant facts of the case, when the purpose
of the testimony is to portray the opposing party
as a member of a class or group that is evil and
deserving of punishment. It is improper to
suggest, in a criminal case, that people, charged
with certain crimes are dangerous and violent
individuals who must be stopped to keep them
from killing or harming their victims and the
families, friends, and the pets of the victims. A

10

state cannot present evidence of bad acts of unknown members of a class of "batterers" and use such bad act evidence to convict the defendant. These violations deprive the defendant of his rights to a fair trial, due process of law, and to confront witnesses and evidence as guaranteed by the United States Constitution.

PROPOSITION OF LAW NUMBER TWO

The defendant's federal constitutional rights to a fair trial and due process of law are violated when the trial court allows the state to: (1) present evidence impeaching the defendant on an inadmissible collateral matter and arguing that it had scientific evidence proving that the defendant was lying and that the complainant was telling the truth, (2) introduce other unrelated bad act evidence used to show that the defendant was a thief and associated with violent and dangerous people, (3) present improper character evidence to suggest that the defendant was mentally unbalanced and paranoid and therefore more likely to commit crimes, (4) present opinion evidence from the investigating detective that the complainant was telling the truth and that the defendant was lying.

PROPOSITION OF LAW NUMBER THREE

The defendant is denied the constitutional right to effective assistance of counsel due to the failure of counsel to properly object to patently inadmissible evidence which resulted in an extremely unfair trial.

PROPOSITION OF LAW NUMBER FOUR

The state must establish that statements obtained through interrogation were knowingly and voluntarily made and cannot use statements made

> in violation of the defendant's Miranda rights
> and his right to counsel.

*Exhibit 12 to Return of Writ*.  On December 3, 2008, the Ohio Supreme Court denied leave to appeal and dismissed the appeal as not involving any substantial constitutional question.  *Exhibit 14 to Return of Writ*.

On September 5, 2008, petitioner, proceeding *pro se*,  filed an application for reopening his appeal pursuant to App.R. 26(B).  Petitioner asserted ineffective assistance of appellate counsel and set forth the following assignments of error reprinted here verbatim:

> Assignment of Error No. 1: Appellant was denied effective assistance of appellate counsel when appellate counsel failed to raise or address in his direct appeal prosecutorial misconduct.  The trial prosecutor allowed his witness Amy Stewart (victim) to give testimony that was inconsistent with the prior recorded statement given by her to the investigating authorities. In violation of Appellant's 6th and 14th Amendment rights of the U.S. Constitution.
>
> Assignment of Error No. 1-A: Appellant was denied effective assistance of appellate counsel, when appellate counsel failed to raise or address in his direct appeal prosecutorial misconduct during the state's closing arguments (improper statements), in violation of Appellant's 6th and 14th Amendment rights of the U.S. Constitution.
>
> Assignment of Error No. 2.  Appellant was denied effective assistance of appellate counsel when appellate counsel failed to raise or address in his direct appeal. Ineffective assistance of trial counsel, for trial counsels failure to conduct a reasonable, adequate investigation in violation of Appellant's 6th and 14th Amendment rights of the U.S. Constitution.
>
> Assignment of Error No. 2-A: Appellant was denied effective

12

assistance of appellate counsel when appellate counsel failed to raise or address in his direct appeal. Ineffective assistance of trial counsel for trial counsels failure to introduce into evidence information that demonstrates his clients factual innocence, or that raises sufficient doubts as to that question to undermine confidence in the verdict. In violation of Appellants 6th and 14th Amendment rights of the U.S. Constitution.

Assignment of Error No. 2-B: Appellant was denied effective assistance of appellate counsel when appellate counsel failed to raise or address in his direct appeal. Ineffective assistance of trial counsel, for trial counsel's failure to impeach witness Amy Steward (alleged victim) trial testimony with her previous inconsistent recorded statement given by her to the investigating authorities. Nor did trial counsel object to the improper statements made by the State in their closing arguments. In violation of Appellant's 6th and 14th Amendment rights of the U.S. Constitution.

*Exhibit 15 to Return of Writ.*

On November 25, 2008, the Court of Appeals denied petitioner's application for reopening. *Exhibit 20 to Return of Writ.* On January 8, 2009, petitioner, again proceeding *pro se*, filed an appeal of the denial of his application for reopening. The propositions of law petitioner set forth were identical to the assignments of error he raised before the Court of Appeals as set forth above. *Exhibit 23 to Return of Writ.* According to the on-line docket of the Ohio Supreme Court, see www.supremecourt.ohio.gov, that appeal was dismissed on March 25, 2009.

On April 7, 2010, petitioner, still proceeding *pro se*, filed the instant petition for a writ of habeas corpus pursuant to 28 U.S.C. §2254. He alleges that he is in the custody of the

13

respondent in violation of the Constitution of the United States based upon the following

grounds raised on the face of the petition:

    1.    <u>Ground One for Relief</u>

        Shawn Drew was deprived of his rights to a fair trial, to due process of law, and to confront witnesses and evidence as guaranteed by the United States Constitution.

    II.    <u>Ground Two for Relief</u>

        Shawn Drew was deprived of his rights to a fair trial and due process when prosecutorial misconduct in the form of introduction of inadmissible evidence is permitted by the trial court.

    III.    <u>Ground Three for Relief</u>

        Shawn Drew was denied the effective assistance of counsel guaranteed by the Sixth Amendment of the Constitution of the United States.

    IV.    <u>Ground Four for Relief</u>

        The State violated Shawn Drew's Miranda rights and his right to counsel via unlawful interrogation practices, thus denying him due process.

    V.    <u>Ground Five for Relief</u>

        Shawn Drew was denied his right to effective assistance of counsel on appeal as guaranteed by the Sixth Amendment and Fourteenth Amendment right of due process.

It is the position of the respondent that petitioner's claims either are not cognizable

in habeas corpus, are procedurally defaulted, or fail on their merits.  Because respondent

has raised the issue of procedural default, the Court will begin its discussion there.

## PROCEDURAL DEFAULT

In recognition of the equal obligation of the state courts to protect the constitutional rights of criminal defendants, and in order to prevent needless friction between the state and federal courts, a state criminal defendant with federal constitutional claims is required fairly to present those claims to the highest court of the state for consideration.  28 U.S.C. §2254(b), (c). If he fails to do so, but still has an avenue open to him by which he may present the claims, his petition is subject to dismissal for failure to exhaust state remedies. *Id.;Anderson v. Harless*, 459 U.S. 4, 6 (1982) (*per curiam*; *Picard v. Connor*, 404 U.S. 270, 275-76 (1971). If, because of a procedural default, the petitioner can no longer present his claims to a state court, he has also waived them for purposes of federal habeas review unless he can demonstrate cause for the procedural default and actual prejudice resulting from the alleged constitutional error.  *Murray v. Carrier*, 477 U.S. 478, 485 (1986);  *Engle v. Isaac*, 456 U.S. 107, 129 (1982);*Wainwright v. Sykes*, 433 U.S. 72, 87 (1977).

In the Sixth Circuit, a four-part analysis must be undertaken when the state argues that a federal habeas claim is precluded by the petitioner's failure to observe a state procedural rule.  *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir.1986). "First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule." *Id*. Second, the Court must determine whether the state courts actually enforced the state procedural sanction.  *Id.*

Third, it must be decided whether the state procedural forfeiture is an adequate and independent state ground on which the state can rely to foreclose review of a federal constitutional claim.  *Id*.  Finally, if the Court has determined that a state procedural rule was not complied with and that the rule was an adequate and independent state ground, then the petitioner is required to demonstrate that there was cause for him not to follow the procedural rule and that he was actually prejudiced by the alleged constitutional error.  *Id*.  This "cause and prejudice" analysis also applies to failure to raise or preserve issues for review at the appellate level. *Leroy v. Marshall*, 757 F.2d 94 (6th Cir.1985).

Respondent contends that the portion of petitioner's fourth claim alleging a violation of his right to counsel in connection with his interrogation by Detective Phillips is procedurally defaulted because petitioner did not raise this issue in his pre-trial motion to suppress.   The appellate court therefore refused to address the merits of this claim:

> {¶ 85} With respect to appellant's argument that his Sixth Amendment right to counsel was violated because Detective Phillips interviewed him after counsel had been appointed at his arraignment, we concur with the state that this argument has been waived. Although appellant's motion to suppress identifies the Sixth Amendment as one of its bases, this argument was neither developed in the body of the motion nor pursued at the hearing. Thus, by failing to pursue this argument at the suppression hearing, appellant abandoned litigation of this issue. *State v. England*, Franklin App. No. 05AP793, 2006-Ohio-5087, at ¶ 12-14. We therefore conclude that, for purposes of this appeal, appellant has waived this issue. Therefore, this court need not address this issue here for the first time.

16

Further, petitioner may now no longer present this claim to the state courts under Ohio's doctrine of res judicata.  *State v. Cole*, 2 Ohio St.3d 112 (1982); *State v. Ishmail*, 67 Ohio St.2d 16 (1981); *State v. Perry*, 10 Ohio St.2d 175 (1967). The Court therefore deems the first and second parts of *Maupin* to have been met with respect to petitioner's claim.

The Court must next decide whether the procedural rule at issue constitutes an adequate and independent basis upon which to foreclose review of the petitioner's federal constitutional claims.  This task requires the Court to balance the state's interests behind each procedural rule against the federal interest in reviewing federal claims.  *See Maupin v. Smith*, 785 F.2d at 138.  The initial procedural default was the failure to raise the issue in a pretrial motion to suppress.  Courts have held that a state procedural rule requiring such issues to be raised in a pretrial motion to suppress are adequate and independent grounds upon which to rest a denial of the claim.  *See, e.g., Schmitt v. Kelly*, 189 Fed. Appx. 257 (4th Cir. July 13, 2006). As to the reason the claim can no longer be raised, the Court of Appeals for the Sixth Circuit has consistently held that Ohio's doctrine of res judicata, i.e., the *Perry* rule, is an adequate ground for denying federal habeas relief.  *Lundgren v. Mitchell*, 440 F.3d 754, 765 (6th Cir.2006);  *Coleman v.Mitchell*, 268 F.3d 417, 427-29 (6th Cir.2001); *Seymour v. Walker*, 224 F.3d 542, 555 (6th Cir.2000); *Byrd v. Collins*, 209 F.3d 486, 521-22 (6th Cir.2000); *Norris v. Schotten*, 146 F.3d 314, 332 (6th Cir.1998). The doctrine of res judicata is stated in unmistakable terms in countless Ohio decisions, and Ohio courts have consistently refused, in reliance on that doctrine,

to review the merits of claims. *See State v. Cole, supra; State v. Ishmail, supra.*  Further, the doctrine of res judicata serves the state's interest in finality and in ensuring that claims are adjudicated at the earliest possible opportunity. With respect to the independence prong, the Court concludes neither of these grounds rely on or otherwise implicate federal law. The third part of the *Maupin* test has been met.

    Beyond the four-part *Maupin* analysis, this Court is required to consider whether this is "an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray v. Carrier*, 477 U.S. at 491; *see also Sawyer v. Whitley*, 505 U.S. 333.  After review of the record, the Court does not deem this to be such a case.   Consequently, the Court will not consider the portion of petitioner's fourth claim relating to the denial of the right to counsel because of petitioner's procedural default.

## CLAIMS ONE AND TWO

    According to the memorandum in support of the petition, petitioner's first claim relates to the admission of the testimony of a domestic violence expert.  Petitioner contends that the admission of this testimony deprived him of due process, his right to a fair trial, and his right to confront witnesses.   Petitioner's second claim, as explained in his memorandum, is that he was deprived of due process and a fair trial as a result of several instances of prosecutorial misconduct.  These alleged instances include (1) the presentation of evidence impeaching petitioner on an inadmissible collateral matter and argument indicating that scientific evidence proved that petitioner was lying and the

victim was telling the truth; (2) the introduction of unrelated bad acts evidence; (3) the presentation of improper character evidence; and (4) the presentation of evidence from the investigating detective that petitioner was lying and the victim was telling the truth.

In order to exhaust available state remedies, a petitioner must first fairly present the substance of his federal habeas corpus claims to the state courts. *Picard v. Connor*, 404 U.S. 270, 275, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971); *Anderson v.Harless*, 459 U.S. 4, 6, 103 S.Ct. 276, 74 L.Ed.2d 3 (1982). "The state courts must be provided with a fair opportunity to apply controlling legal principles to the facts bearing upon petitioner's constitutional claims." *Sampson v. Love*, 782 F.2d 53, 55 (6th Cir.1986). Petitioner does not fairly present his claim simply because the necessary facts supporting a federal constitutional claim are present or because the constitutional claim appears self evident. *Haggins v. Warden*, 715 F.2d 1050, 1054 (6th Cir.1983) (*citing Harless*, 459 U.S. at 6). Furthermore, "[a] petitioner 'fairly presents' his claim to the state courts by citing a provision of the Constitution, federal decisions employing constitutional analysis, or state decisions employing constitutional analysis in similar fact patterns." *Levine v. Torvik*, 986 F.2d 1506, 1515 (6th Cir.1993) (*citing Franklin v. Rose*, 811 F.2s 322, 326 (6th Cir.1987)). Courts normally require more than a single broad generalization that petitioner was denied a "fair trial" or "due process of law." *Franklin*, 811 F.2d at 326; *Petrucelli v. Coombe*, 735 F.2d 684, 688 (6th Cir.1984).  Petitioner, however, need not "cite book and verse on the federal constitution." *Picard*, 404 U.S. at 277 (*quoting Daugharty v. Gladden*, 257 F.2d 750, 758 (9th Cir.1960)). The Sixth Circuit has strictly followed the

19

requirement that petitioner fairly presented his federal constitutional claims to the state

courts as a precondition to federal habeas review. *Weaver v. Foltz*, 888 F.2d 1097, 1098

(6th Cir.1989).

      The record reflects that, on direct appeal, petitioner did not present either of

these claims as federal constitutional issues.  Petitioner raised the issue of the admission

of expert testimony relating to domestic violence in terms of trial court error in the

application of state evidentiary rules only.  He did not refer to a single federal case or

state case relying on federal law in support of his claim.  *Exhibit* 9 *to Return of Writ, pp.*

*26-31*.  Further, he did not refer to the Confrontation Clause nor did he refer to any cases

discussing the application of the Confrontation Clause in support of his claim.  *Id*.  The

state appellate court likewise reviewed petitioner's claim for an alleged violation of

state evidentiary rules only:

> {¶ 46} As previously explained, the admission of evidence,
> including expert testimony, lies within the sound discretion of the
> trial court and will not be disturbed on appeal absent an abuse of
> discretion. *Williams, supra*; *State v. Russell*, Franklin App. No.
> 03AP-666, 2004-Ohio-2501, *citing Renfro v. Black* (1990), 52 Ohio
> St.3d 27, 556 N.E.2d 150. An abuse of discretion connotes more than
> a mere error of judgment; it implies a decision is without a
> reasonable basis and one that is clearly wrong. *Blakemore, supra*.
> Thus, as we understand it, the issue presented by appellant's
> argument under this assignment of error is whether the admission
> of Heller's expert testimony, which concerned the dynamics of
> relationships in which domestic violence occurs, in general, was
> appropriate.FN3
>
> FN3. "Evidence regarding battered-woman syndrome is not limited
> to cases where domestic violence is the underlying charge, and
> does not require a showing that the parties lived together." *State v.
> Caudill*, Wood App. No. WD-07-009, 2008-Ohio-1557, at ¶ 41.

20

{¶ 47} In *State v. Koss* (1990), 49 Ohio St.3d 213, 551 N.E.2d 970, the Supreme Court of Ohio first recognized the admissibility of expert testimony regarding battered-woman syndrome when in support of a self-defense claim. In *State v. Haines*, 112 Ohio St.3d 393, 860 N.E.2d 91, 2006-Ohio-6711, the court extended its holding in *Koss* to allow the admission of expert testimony of battered-woman syndrome can be introduced by the state in a domestic violence case to aid the trier of fact in understanding the victim's actions.

{¶ 48} "If a woman is established to be a battered woman, and the expert is qualified, expert testimony regarding battered-woman syndrome presented in the state's case-in-chief is admissible 'to help a jury understand a victim's reaction to abuse in relation to her credibility.' " *Caudill, supra*, at ¶ 39, *quoting Haines, supra*, at ¶ 29, 35, 860 N.E.2d 91, *citing Koss, supra*, at 218, 551 N.E.2d 970.

{¶ 49} Evidence regarding battered-woman syndrome must be admitted in accordance with the rules of evidence, and "[r]elevance under Evid.R. 401 is the first hurdle to clear." *Haines, supra*, at ¶ 44. " 'Generally, battered woman syndrome testimony is relevant and helpful when needed to explain a complainant's actions, such as prolonged endurance of physical abuse accompanied by attempts at hiding or minimizing the abuse, delays in reporting the abuse, or recanting allegations of abuse.' " *Id., quoting People v. Christel* (1995), 449 Mich. 578, 580, 537 N.W.2d 194. These apparent inconsistencies may impact a victim's credibility, and, thus, "the prosecution need not wait until rebuttal to present expert testimony on battered woman syndrome." *Id., quoting State v. Grecinger* (Minn.1997), 569 N.W.2d 189, 193.

{¶ 50} Although such testimony "can be relevant for explaining a victim's behavior, it cannot be considered relevant if there is no evidence that the victim suffers from battered woman syndrome." Id. at ¶ 46. To be classified as a battered woman, " 'the couple must go through the battering cycle at least twice. Any woman may find herself in an abusive relationship with a man once. If it occurs a second time, and she remains in the situation, she is defined as a battered woman.' " *Id.* at 49, *quoting Koss*, 49 Ohio St.3d at 216, 551 N.E.2d 970, *quoting Walker, The Battered Woman* (1979) at xv.

{¶ 51} As with all expert testimony, the party seeking to introduce battered woman syndrome evidence must lay a proper evidentiary

21

foundation. This entails " 'substantiating that the conduct and behavior of the witness is consistent with the generally recognized symptoms of the battered woman syndrome, and that the witness has behaved in such a manner that the jury would be aided by expert testimony which provides a possible explanation for the behavior.' " Id. at ¶ 47, 551 N.E.2d 970, *quoting State v. Stringer* (1995), 271 Mont. 367, 378, 897 P.2d 1063. Succinctly stated, evidence that establishes "the cycles of a battering relationship is appropriate foundation for battered-woman-syndrome expert testimony." *Id.* at ¶ 48, 897 P.2d 1063.

{¶ 52} Even if all the foregoing requirements have been met, a court must still consider whether the expert's testimony poses the danger of unfair prejudice, and, thus violates Evid.R. 403. The court addressed this issue in Haines, and adopted the limited format approach that is used in most other jurisdictions. "Under this approach, experts who are called to testify in domestic violence prosecutions must limit their testimony to the general characteristics of a victim suffering from the battered woman syndrome. The expert may also answer hypothetical questions regarding specific abnormal behaviors exhibited by women suffering from the syndrome, but should never offer an opinion relative to the alleged victim in the case." *Id*. at ¶ 56, 860 N.E.2d 91, *quoting Hawes, Removing the Roadblocks to Successful Domestic Violence Prosecutions: Prosecutorial Use of Expert Testimony on the Battered Woman Syndrome in Ohio* (2005), 53 Clev.St.L.Rev. 133, 158. In addition to limiting the expert's testimony, the Court further advised that "[t]rial courts should tailor the scope of the state's questioning, and should also ensure that jurors are instructed as to the limits of the expert's testimony." *Id*. at ¶ 57, 860 N.E.2d 91.

{¶ 53} In this case, a review of the record discloses that the admission of Heller's testimony was proper and the appropriate evidentiary foundation was laid. The state presented sufficient evidence that A.S. was a battered woman. A.S. testified about several incidents of abuse that had occurred during her relationship with appellant, despite which, she remained in a relationship with appellant. We find that this is sufficient to establish that A.S. behaved in a manner consistent with a battered woman.

{¶ 54} We further find that the trial court properly found that Heller was an expert in the field of domestic violence, and, therefore, she

was qualified to provide testimony regarding why a victim might delay in reporting or fully disclosing the details of abuse. Indeed, appellant's trial strategy was to impeach A.S. by suggesting that she had fabricated the incidents of sexual abuse because, although she claimed to be afraid of appellant, she reported the incidents of physical abuse in a timely manner but delayed in reporting the alleged sexual abuse. (Tr. at 470.)

{¶ 55} Heller testified during the state's case-in-chief, and her testimony complied with the dictates set forth in Haines: she neither expressed an opinion as to appellant's guilt nor did she opine as to whether A.S. suffered from battered-woman's syndrome. Heller explained that abuse in intimate relationships usually follows a pattern known as the "cycle of violence." (Tr. at 503.) She identified the first phase as the "tension building" phase, during which there is a lot of arguing and the victim is "walking on eggshells." Id. That phase "moves into" a violent episode or incident, during which, "there is a great deal of intimidation and threatening behavior or the victim is actually physically or sexually assaulted." *Id*. "From there, it moves into" the "honeymoon phase," where the perpetrator may initially apologize, but, eventually, this "becomes less of an apology on the part of the perpetrator of domestic violence and more of a blaming of the victim." *Id*. at 504, 860 N.E.2d 91. Heller discussed the "power and control wheel," which identified tactics and methods the abuser will utilize to gain power and control. *Id*. at 506, 860 N.E.2d 91. Such behaviors included: visual intimidation, destruction of property or something of significance to the victim, the use of threats and coercion, including threats with a weapon and threats against the victim's family and friends, financial exploitation, verbal and emotional harassment, blaming the victim, and isolating the victim. *Id*. at 506-512, 860 N.E.2d 91. She also explained that domestic violence "occurs on a continuum," thus, while it may start out with "verbal and psychological abuse," it tends to "move into more physically violent behaviors," and can also include "sexually abusive behaviors." *Id*. at 512, 860 N.E.2d 91. According to Heller, a victim may not disclose what is going on because "they're embarrassed and ashamed," and may stay in an abusive relationship out of fear for themselves, their family, and friends. Id. at 513, 860 N.E.2d 91. In fact, Heller noted that fear was the "biggest reason" why a victim stays in the relationship. *Id*. at 514, 860 N.E.2d 91.

{¶ 56} A review of Heller's testimony discloses that she sufficiently explained why a victim might delay in reporting incidents of abuse or leaving the abuser, i.e., fear, embarrassment, and shame. And, contrary to appellant's assertion, which we note was not supported by any legal authority, Heller was not required to explain why a victim might report having been physically abused but would delay in reporting having been sexually abused and/or raped.FN4 Rather, it was sufficient that Heller explained why a victim might delay in reporting any abuse. At trial, appellant aggressively highlighted what he felt was an inconsistency in A.S.'s behavior, and, to the extent any inconsistency existed, such was for the trier of fact to determine.FN5

FN4. Indeed, appellant states in his brief that "[r]ape is an aberrant act * * *." (Appellant's brief, at 20.)

FN5. As an aside, we note that Detective Phillips testified that during his first interview with A.S., she mentioned having been sexually assaulted by appellant, but she was "unwilling to talk about it" because "she was afraid." (Tr. at 386, 450.) Thus, A.S.'s reporting of abuse was not as bifurcated as he asserts.

{¶ 57} Based on the foregoing, we find Heller's expert testimony was relevant and helpful to the jury because it involved matters beyond the jurors' knowledge or experience, dispelled misconceptions common to lay persons, and aided the jury in understanding A.S.'s actions. Therefore, the trial court did not abuse its discretion in allowing Heller's expert testimony. As such, we overrule this assignment of error.

*State v. Drew,* 2008 WL 2349649 at **10-13;  *Exhibit 10 to Return of Writ.*

Likewise petitioner's second claim was raised before the state appellate court in terms of trial court error in its application of state evidentiary rules only.  While petitioner asserted generally that he had "an absolute right to a fair trial," he did not rely on federal law to support his claim.  *Exhibit 9 to Return of Writ, pp. 10-24.*  As a result, the state appellate court did not review petitioner's claim for a constitutional

violation, but rather for an alleged violation of state evidentiary rules.  *Exhibit 10 to Return of Writ, pp. 8-16.*  As discussed by the state appellate court:

> {¶20} ... In his first assignment of error, appellant asserts that the trial court erred throughout the trial in this matter in allowing inadmissible evidence presented by the state. And, in his second assignment of error, appellant contends that his trial counsel was ineffective for failing to object to said evidence.

> {¶ 21} At the onset, we note that appellant's first assignment of error includes constitutional challenges to the admissibility of the statements he made to Detective Phillips. As explained, infra, in our analysis of appellant's sixth assignment of error, we do not find the trial court erred when it denied appellant's motion to suppress. Thus, we shall address the statements with which appellant takes issue as they relate to the Ohio Rules of Evidence.  (footnote omitted).

> {¶ 22} "A trial court has broad discretion in the admission or exclusion of evidence, and its judgment will not be reversed absent a clear showing of an abuse of discretion with attendant material prejudice to the defendant." *State v. Rowe* (1993), 92 Ohio App.3d 652, 665, 637 N.E.2d 29; *Krischbaum v. Dillon* (1991), 58 Ohio St.3d 58, 66, 567 N.E.2d 1291 (stating, in part, that "[i]n the absence of an abuse of that discretion which results in a material prejudice to a defendant, an appellate court should be slow to reverse evidentiary rulings"). "The term 'abuse of discretion' connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 450 N.E.2d 1140. When applying the "abuse of discretion" standard, an appellate court is not free to merely substitute its judgment for that of the trial court. *State v. Sibert* (1994), 98 Ohio App.3d 412, 424, 648 N.E.2d 861.

> {¶ 23} Having set forth the parameters of our discussion and the appropriate legal standard, we will discuss each piece of evidence in turn.

> A. Appellant's statement to Detective Phillips' that A.S. was a drug abuser and had engaged in sex with other men.

{¶ 24} During trial, Detective Phillips testified that appellant told him that A.S. was abusing drugs and engaging in "sexcapades." (Tr. at 396.) Appellant argues that this statement was made in response to a question posed by Detective Phillips, which asked appellant to speculate as to why A.S. would make false allegations against him. Appellant asserts that Detective Phillips' testimony was inadmissible because of the way in which the statement was elicited, explaining that "[t]his question and the answer would not be admissible in court because it is highly improper to ask a witness to comment upon the credibility of another witness or to give a speculative answer that is not based on personal knowledge." (Appellant's brief, at 19.) For several reasons, however, appellant's argument fails.

{¶ 25} To begin, appellant's depiction of this statement's factual backdrop is inaccurate. This statement did not first arise in response to a question posed by Detective Phillips, but, rather, appellant offered this statement without prompting within the first 15 minutes of his March 12, 2006 interview with Detective Phillips. After appellant voluntarily detailed how A.S. was allegedly using her friend, who was a police officer, to make trouble for him, appellant then stated, "I'll tell you exactly what it is man, the young lady has a drug habit." State's Exhibit 2.

{¶ 26} Regardless of the setting, appellant's statement is admissible under Evid.R. 801(D)(2)(a), which provides that a statement offered against a party is not hearsay, even though it is an out-of-court statement, when it is the party's own statement. *See, e.g., State v. Byrd* (1987), 32 Ohio St.3d 79, 89, 512 N.E.2d 611.

B. The results of A.S.'s hair analysis.

{¶ 27} Appellant asserts that the admission of the results of A.S.'s hair sample submitted for drug analysis were inadmissible because it was extrinsic evidence used for the purpose of collateral impeachment. According to appellant, the state used this evidence to "scientifically disprove" his statement that A.S. was on drugs, which impermissibly depicted appellant as the liar while portraying A.S. as the truth teller. (Appellant's brief, at 19.)

{¶ 28} Evid.R. 806(A) provides that "[w]hen a hearsay statement, or a statement defined in Evid. R. 801(D)(2), (c), (d), or (e), has been

admitted in evidence, the credibility of the declarant may be attacked, and if attacked may be supported, by any evidence that would be admissible for those purposes if declarant had testified as a witness." Although Evid.R. 806 does not specifically include statements defined in Evid. R. 801(D)(2)(a), the rule under which appellant's statement came in, it has been held that this rule applies to such statements. *See, e.g., State v. Heinish* (1990), 50 Ohio St.3d 231, 553 N.E.2d 1026; *State v. Tutolo* (Mar. 12, 1992), Cuyahoga App. No. 60071; *see, also, United States v. Shay* (C.A.1, 1995), 57 F.3d 126, 132; *States v. Velasco* (C.A.7, 1992) 953 F.2d 1467, 1473 ("The [Senate Judiciary] committee considered it unnecessary to include statements contained in rule 801(d)(2)(A) and (B)-the statement by the party-opponent himself or the statement of which he has manifested his adoption-because the credibility of the party-opponent is always subject to an attack on his credibility [sic]."), *quoting* Notes of the Committee on the Judiciary, Rep. No. 1277, 93d Cong., 2d Sess., reprinted in 1974 U.S .C.C.A.N. 7051, 7069 fn.28.

{¶ 29} Here, throughout appellant's interviews with Detective Phillips, he repeatedly accused A.S. of using drugs, and theorized her alleged drug use was the impetus for her making the allegations against him. In fact, testing A.S. for drugs was appellant's own idea, and he implored Detective Phillips to follow through.FN2 In any event, having found appellant's statement admissible, the inquiry under Evid.R. 806 then becomes: if appellant had testified at trial that A.S. was a drug user, would the state have been permitted to impeach appellant with the results of A.S.'s hair sample analysis, which would disprove his testimony? We answer that question in the affirmative, and find the results of A.S.'s hair sample analysis constitute admissible evidence.

FN2. We note the state's astute observation that "had the detective not had the drug testing completed and the evidence not had been presented, the defendant's argument would have been that the detective failed to do his job and that [A.S.] really was a drug user." (Appellee's brief, at 15.)

C. Detective Phillips' testimony regarding his impression of appellant's mental state.

*7 {¶ 30} Appellant complains about the following testimony given

by Detective Phillips in response to a question posed by the state, which asked Detective Phillips to discuss appellant's agitation during his interview:

When he would talk about the sex acts, anal sex. He also got agitated when I not [sic] confronted him but when I told him that [A .S.] had suspicions about why his behavior had changed so dramatically over the last couple of months; as far as her suspicions, what it could be related to as far as drug use and things of that nature.

And then I said that, "She thinks that you might be paranoid. She thinks that you might have some mental instability." When I said, "To be honest with you, what you're saying does sound paranoid," he didn't like that at all.

You know, he was very agitated that I-after listening to everything he was saying that I mentioned that it did sound paranoid to me, he got particularly agitated.

(Tr. at 410-411.) According to appellant, the above-quoted testimony was "extremely damaging," constituted hearsay, and ran afoul of Evid.R. 404(A).

{¶ 31} Assuming without deciding that we find the aforementioned testimony was inadmissible, the error was harmless. The Supreme Court of Ohio has held that error is harmless if "there is no reasonable possibility that the evidence may have contributed to the accused's conviction." *State v. Bayless* (1976), 48 Ohio St.2d 73, 357 N.E.2d 1035, paragraph seven of the syllabus. The court has also stated that it is appropriate to find error harmless where there is "either overwhelming evidence of guilt or some other indicia that the error did not contribute to the conviction." *State v. Ferguson* (1983), 5 Ohio St.3d 160, 166, fn. 5, 450 N.E.2d 265. When considering whether error is harmless, our judgment is based on our own reading of the record and on what we determine is the probable impact the statement had on the jury. *See State v. Kidder* (1987), 32 Ohio St.3d 279, 284, 513 N.E.2d 311.

{¶ 32} In this case, A.S. testified that appellant had threatened her, had been physically violent, and described having been forced to perform oral sex on appellant, as well as having been forced to

28

submit to anal sex by appellant. In recounting one incidence of physical violence, A.S. testified that while appellant was hitting her, appellant was "growling," not talking in "complete sentences," and told her that he knew that she had cheated on him from looking at the toppings on someone's hamburger. (Tr. at 127.) She also described the change in appellant's behavior towards her as sudden, and "wondered whether or not" appellant had a "mental illness" or had been using drugs. Id. at 107, 513 N.E.2d 311.

{¶ 33} In addition to A.S.'s testimony, Detective Phillips testified that appellant accused A.S. of having anal sex with a variety of individuals, including his uncle. Detective Phillips also testified that appellant told him that he had once gone to a crack house and knew A.S. was there because he heard her "moaning and groaning" in another room, while she was engaging in anal sex. Id. at 403-404, 513 N.E.2d 311.

{¶ 34} Based on the nature of the testimonies discussed above, Detective Phillips' specific testimony as challenged by appellant is cumulative evidence, and such evidence is cumulative in its effect. *See, e.g., State v. Crawford* (Feb. 6, 1986), Franklin App. No. 85AP-324. Thus, assuming Detective Phillips' testimony was inadmissible, we find that its admission was harmless beyond a reasonable doubt given the other admissible evidence establishing appellant's guilt.

D. Detective Phillips' testimony regarding appellant's statement about A.S.'s ultrasound.

{¶ 35} Detective Phillips testified that appellant told him that A.S.'s obstetric ultrasound depicted "the baby spinning around and around" and attributed the spinning to A.S.'s "drug use." (Tr. at 419.) Appellant argues that this testimony was inadmissible and introduced as "other act evidence." Contrary to appellant's assertion, as we explained supra, appellant's statement is admissible under Evid.R. 801(D)(2).

E. A.S.'s testimony regarding appellant forcing her to withdraw money from an ATM.

{¶ 36} During trial, A.S. testified that appellant forced her to withdraw money from her bank account because "someone

accused him of having stolen some money," and even though appellant denied the accusation to A.S., he said he needed to replace the money because "this person knew where his family lived and they would hurt his family." (Tr. at 112.) Appellant contends this testimony was inadmissible because it was irrelevant to the charges against him, and was offered for the purpose of establishing that he was a "violent and dangerous criminal" because he "associated with dangerous people who were probably engaged in criminal activity and that he had stolen from them." (Appellant's brief, at 22.)

{¶ 37} "Evidence of other crimes, wrongs, or acts" may be admissible "as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Evid.R. 404(B). Thus, we previously held that "all of the circumstances" surrounding alleged sexual contact are relevant to the forcible element of rape and related offenses. *See State v. Worrell*, Franklin App. No. 04AP-410, 2005-Ohio-1521, at ¶ 32, reversed on other grounds, In re Ohio Crim. Sentencing Statutes Cases, 109 Ohio St.3d 313, 847 N.E.2d 1174, 2006-Ohio-2109; State v. Drayer, 159 Ohio App.3d 189, 823 N.E.2d 492, 2004-Ohio-6120, at ¶ 5, *vacating State v. Drayer*, Franklin App. No. 03AP-1033, 2004-Ohio-5061. As this court stated in Worrell, "pursuant to Evid.R. 404(B), 'evidence of physical, emotional, and verbal abuse upon the victim or other family members, even if not included in the indictment, has been permitted in numerous jurisdictions in cases involving rape and related sex offenses." Id. at ¶ 32, *quoting State v. Madsen*, Cuyahoga App. No. 82399, 2003-Ohio-5822, at ¶ 27, *quoting State v. Williamson*, Cuyahoga App. No. 80982, 2002-Ohio-6503.

*9 {¶ 38} Because rape cases charged under R.C. 2907.02(A)(2) require proof of force or threat of force, evidence of the defendant's physical and psychological abuse upon the victim is "relevant and probative of a method of control used to force sex upon the victim" and is "inextricably related" to the rape charge. *Madsen, supra*, at ¶ 28. Likewise, evidence of a defendant's prior physical abuse upon a victim explains the victim's acquiescence to the sexual abuse. State v. Doup, Knox App. No. 02CA000008, 2002-Ohio-6981, at ¶ 48.

{¶ 39} In this case, the incident in which appellant forced A.S. to withdraw money from her bank account occurred two days prior to

30

> the first sexual assault. A.S. testified that appellant was "really
> frantic to get the money" and "worried that he might escalate into
> anger towards [her] because of how upset he was." (Tr. at 113-114.)
> Accordingly, this evidence depicted the use of coercive tactics and
> pressure that appellant used to rape A.S., and explained her state of
> mind during the rapes, as well as her submission. Therefore, we
> conclude that the trial court did not err by admitting this testimony
> into evidence.

*State v. Drew*, 2008 WL 2349649 at **5-9.

Petitioner has failed to establish cause and prejudice for his failure to present these federal claims to the state appellate court. As to the prejudice prong, even if these claims had been presented to the state courts as federal constitutional claims, there is simply no merit - largely for the reasons set forth in the state Court of Appeals' opinion - to the claim that petitioner was deprived of a fundamentally fair trial based on the admission of any of this evidence. He has therefore waived his right to present such claims in this proceeding.

## CLAIMS THREE, FOUR and FIVE

## THE STANDARD OF REVIEW

The provisions of the Antiterrorism and Effective Death Penalty Act, Pub.L. 104-132, 110 Stat. 1214 (AEDPA) govern the scope of this Court's review. *See Penry v. Johnson*, 532 U.S. 782, 791, 121 S.Ct. 1910, 150 L.Ed.2d 9 (2001); *Wilson v. Parker*, 515 F.3d 682, 691 (6th Cir.2008). AEDPA imposes a "highly deferential standard for evaluating state-court rulings," *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and "demands that state-court decisions be given the benefit of the doubt," *Woodford v. Visciotti*, 537 U.S. 19, 24, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002) (per curiam ).

*Renico v. Lett*, 130 S.Ct. 1855, 1862 (2010)(footnote omitted) .

When the claims presented in a habeas corpus petition have been presented to and decided by the state courts, a federal habeas court may not grant relief unless the state court's decision was contrary to or an unreasonable application of clearly established federal law, or based on an unreasonable determination of the facts in light of the evidence that was presented.  28 U.S.C. § 2254(d) provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

As the Supreme Court has explained, "an unreasonable application of federal law is different from an incorrect application of federal law." *Williams v. Taylor*, 529 U.S. 362, 410, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); *see also Harbison v. Bell*, 408 F.3d 823, 829 (6th Cir. 2005).  Indeed, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.*, at 411, 120 S.Ct. 1495. Rather, that application must be "objectively unreasonable." *Id.*, at 409, 120 S.Ct. 1495. This distinction creates "a substantially higher threshold" for obtaining relief than de novo review. *Schriro v. Landrigan*, 550 U.S. 465, 473, 127 S.Ct. 1933, 167 L.Ed.2d 836

(2007).  The Court will apply this standard to petitioner's remaining claims.

## A.  CLAIM THREE

Petitioner's third claim is that he was denied the ineffective assistance of trial counsel.  The memorandum attached to the petition argues that trial counsel was ineffective for failing to object to alleged instances of prosecutorial misconduct.

The right to counsel guaranteed by the Sixth Amendment is the right to the effective assistance of counsel. *McMann v. Richardson*, 397 U.S. 759, 771 n. 14 (1970). The standard for demonstrating a claim of ineffective assistance of counsel is composed of two parts:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984). Scrutiny of defense counsel's performance must be "highly deferential." *Id.* at 689.

With respect to the first prong of the *Strickland* test, "[b]ecause of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id* . To establish the second prong of the *Strickland* test, prejudice, a petitioner must demonstrate that there is a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different. *Id*. at 694. "A reasonable

probability is a probability sufficient to undermine confidence in the outcome." *Id.* Because petitioner must satisfy both prongs of the *Strickland* test to demonstrate ineffective assistance of counsel, should the court determine that petitioner has failed to satisfy one prong, it need not consider the other. *Id.* at 697.

The state court of appeals ruled on this claim as follows:

> {¶ 40} Appellant's trial counsel did not object to the admission of the evidence discussed above, and, as such, appellant contends that he received ineffective assistance of counsel.

> {¶ 41} In order to prevail on an ineffective assistance of counsel claim, appellant must meet the two-prong test enunciated in *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674; accord *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, *certiorari denied* (1990), 497 U.S. 1011, 110 S.Ct. 3258, 111 L.Ed.2d 768. Initially, appellant must show that counsel's performance was deficient. To meet that requirement, appellant must show counsel's error was so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. Appellant may prove counsel's conduct was deficient by identifying acts or omissions that were not the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. *Id.* at 690. In analyzing the first prong of Strickland, there is a strong presumption that defense counsel's conduct falls within a wide range of reasonable professional assistance. *Id.* at 689. Appellant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. *Id.*, *citing Michel v. Louisiana* (1955), 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83.

> {¶ 42} If appellant successfully proves that counsel's assistance was ineffective, the second prong of the Strickland test requires appellant to prove prejudice in order to prevail. *Strickland*, at 692. To meet that prong, appellant must show counsel's errors were so serious as to deprive him of a fair trial, a trial whose result is reliable. *Id.* at 687. Appellant would meet this standard with a

showing "that there is a reasonable probability that, but for
counsel's unprofessional errors, the result of the proceeding would
have been different. A reasonable probability is a probability
sufficient to undermine confidence in the outcome." *Id.* at 694.

{¶ 43} Here, we found the evidence challenged by appellant as
having been properly admitted, with the exception being Detective
Phillips' testimony regarding his impression of appellant's mental
state, the admission of which we found to be harmless. The failure
to raise nonmeritorius objections is not deficient performance, and
additionally, appellant cannot show that he was prejudiced by
counsel's failure to raise these issues. Thus, appellant has failed to
demonstrate that he has received ineffective assistance of counsel.

Upon review of the record, the Court is not persuaded that the Court of Appeals'

application of *Strickland* was unreasonable so as to warrant federal habeas review.  28

U.S.C. §2254(d), (e); *Williams v. Taylor, supra*.  Petitioner has not shown that any of the

objections he asserts should have been made by counsel would have been found

meritorious by the Ohio courts, and, in fact, the Court of Appeals found that all of the

matters which petitioner claims his counsel should have objected to - with one

exception - involved the eliciting of admissible evidence.  To the extent that petitioner

asserts that his counsel's failure to object to Detective Phillips' testimony regarding his

mental state constitutes ineffectiveness, petitioner has not demonstrated the

impropriety of the state appellate court's finding that the admission of this testimony

was harmless.  As discussed in the portion of the Court of Appeals' decision quoted

above, that evidence consisted of the detective's observations  - based on things

petitioner told him during their interview - that petitioner was "agitated" and sounded

"paranoid."  There is no reasonable possibility that this statement influenced the

outcome of the trial, especially when the victim herself had already given similar testimony.  Further, no one could view this statement as evidence that petitioner actually suffered from a mental disease.  As a result, petitioner has failed to show that there is a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different.  *Strickland, supra*.  Consequently, petitioner's third claim is without merit.

## B. CLAIM FOUR

In the remaining portion of his fourth claim, (that is, the portion not procedurally defaulted) petitioner asserts that he was denied due process when his *Miranda* rights were violated as a result of unlawful interrogation practices.  According to his memorandum in support of the petition, this claim relates to petitioner's pretrial interrogation by Detective Phillips.  This issue was raised before the Court of Appeals as assignment of error number six challenging the trial court's overruling of a motion to suppress because, according to petitioner, the statements were made in violation of his *Miranda* rights.

For an accused's statement to a police officer, made while the accused was in custody, to be admissible, the prosecution must demonstrate, among other things, that the accused voluntarily, knowingly, and intelligently waived his *Miranda* rights.  *See Miranda v. Arizona*, 384 U.S. 436, 444 (1966).  An effective waiver "must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it."  *Moran v. Burbine*, 475 U.S. 412 (1986).  As

36

explained by the Supreme Court in *Moran*:

> The inquiry has two distinct dimensions.  First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.  Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.

*Moran*, 475 U.S. at 421.

The state court of appeals, in concluding that petitioner had made a voluntary

and informed waiver, stated as follows:

> {¶ 66} In this assignment of error, appellant contends that the trial court erred when it denied his motion to suppress statements he made to Detective Phillips. We disagree.

> {¶ 67} The denial of a motion to suppress involves a mixed question of law and fact. When considering a motion to suppress, the trial court assumes the role of trier of fact, and, therefore, is in the best position to resolve questions of fact and evaluate the credibility of witnesses. *State v. Mills* (1992), 62 Ohio St.3d 357, 366, 582 N.E.2d 972. Consequently, in our review, this court must accept the trial court's findings of fact if they are supported by competent, credible evidence. *State v. Fanning* (1982), 1 Ohio St.3d 19, 437 N.E.2d 583; *State v. Guysinger* (1993), 86 Ohio App.3d 592, 594, 621 N.E.2d 726. However, this court determines as a matter of law, without deferring to the trial court's conclusions, whether these facts meet the applicable legal standard. *State v. Vance* (1994), 98 Ohio App.3d 56, 58, 647 N.E.2d 851, quoting *State v. Williams* (1993), 86 Ohio App.3d 37, 41, 619 N.E.2d 1141; *State v. Klein* (1991), 73 Ohio App.3d 486, 488, 597 N.E.2d 1141.

> {¶ 68} In this case, appellant was interviewed by Detective Phillips on two occasions: March 12, 2006 and March 18, 2006. Appellant's motion to suppress asserted, *inter alia*, that Detective Phillips had interrogated appellant prior to advising him of his Miranda rights, and that the interrogation should have ended when appellant refused to sign the waiver form. Appellant claimed the foregoing

37

violated his constitutional rights, and, as a result, the statements he made to Detective Phillips should have been suppressed. The trial court held a hearing on appellant's motion on April 16, 2007, and the parties stipulated to the admission of State's Exhibit 2, an audio CD of the March 12, 2006, interrogation. After listening to the audio CD, the trial court made the following findings:

THE COURT: I've had an opportunity to listen to the CD recording of the interview that was conducted on this matter. I am going to overrule the motion to suppress.

It appears to me that comments that were made by detective Phillips were very typical comments that, you know, in my experience are made in terms of-especially the initial comments about letting the Defendant know why he was there, what the potential charges were, and the fact that Mr. Drew started speaking to him at that point.

Further into the recording, the detective clearly indicates that if he wants his attorney, he'll just stop everything right there. Even at the very beginning of this, there was a comment made-and while I will acknowledge it wasn't certainly a complete Miranda advisory, he did make the comment that, "You know, Mr. Drew, you have the right to remain silent, you don't have to talk to me."

So, I think that given the totality of the circumstances of this matter, the Court will overrule your motion to suppress the statements.

(Tr. at 42-43.)

{¶ 69} On appeal, appellant argues that his motion to suppress should have been granted because: (1) Detective Phillips interrogated appellant after counsel had been appointed to represent appellant at his arraignment; and (2) Detective Phillips interrogated appellant before advising him of his *Miranda* rights. Thus, appellant asserts that his statements to Detective Phillips were not made knowingly, voluntarily, and intelligently, and buttresses this argument with the fact he did not sign the waiver form.

{¶ 70} The state contends that appellant never specifically requested counsel, and, therefore, the trial court did not err in denying his

motion to suppress. Further, the state asserts that appellant's motion to suppress only concerned whether he waived his rights, which implicates the Fifth Amendment, and not the argument that the appointment of counsel to appellant at his arraignment precluded any contact by or discussion with Detective Phillips, an argument based on the Sixth Amendment. As such, the state contends that appellant has waived the latter.

{¶ 71} We will first address appellant's argument that his Fifth Amendment rights were violated. Appellant's argument addresses both the voluntary nature of his statements and whether he voluntarily waived his *Miranda* rights. Although appellant's argument blurs the distinction, whether appellant's statements were voluntary is analytically different than whether he voluntarily waived his *Miranda* rights. *State v. Underdown*, Franklin App. No. 06AP-676, 2007-Ohio-1814.

{¶ 72} The burden is on the prosecution to prove that appellant made a knowing, intelligent and voluntary waiver of constitutional rights. In *Miranda*, the United States Supreme Court held that interrogation of a suspect in police custody entails certain procedural safeguards, now commonly known as Miranda warnings, to protect a suspect's Fifth and Fourteenth Amendment privilege against self-incrimination. *Miranda*, at 444. Further, the custodial statements of a defendant may not be used against him in a subsequent criminal proceeding unless the prosecution can demonstrate that: (1) defendant was given the *Miranda* warnings; and (2) thereafter made a knowing and intelligent waiver of his Fifth Amendment right against self-incrimination. *Id.* at 479.

{¶ 73} An accused's statement may not be used against him if the statement itself is proved to be involuntary. *State v. Kassow* (1971), 28 Ohio St.2d 141, 277 N.E.2d 435, paragraph one of the syllabus; *Spears v. State* (1853), 2 Ohio St. 583, 585; *State v. Edwards* (1976), 49 Ohio St.2d 31, 39, 358 N.E.2d 1051, citing *Bram v. United States* (1897), 168 U.S. 532, 542, 18 S.Ct. 183, 42 L.Ed. 568 (confession must be voluntary). The basic test for voluntariness is whether the statement is the product of a rational intellect and a free will. *Mincey v. Arizona* (1978), 437 U.S. 385, 398, 98 S.Ct. 2408, 57 L.Ed.2d 290; *Columbus v. Stepp* (Oct. 6, 1992), Franklin App. No. 92AP-486 (question is whether the confession is the product of an essentially free and unconstrained choice by its maker). Statements that are

volunteered, and in no way responsive to any words or actions on the part of the police, are admissible and do not pose a *Miranda* issue. *Miranda*, at 478; *State v. Waddy* (1992), 63 Ohio St.3d 424, 440, 588 N.E.2d 819 (finding that statements not elicited, but volunteered, are not barred by *Miranda*).

{¶ 74} The use of an inherently coercive police tactic during interrogation is a prerequisite to a finding of involuntariness. *Underdown, supra, citing State v. Kelso* (Sept. 25, 1997), Franklin App. No. 96APA12-1755. Such tactics include physical abuse, threats, or deprivation of food, medical treatment, or sleep. *State v. Weeks* (Sept. 18, 2000), Logan App. No. 8-2000-07, *quoting State v. Cooey* (1989), 46 Ohio St.3d 20, 28, 544 N.E.2d 895. There must not only be police misconduct, but such misconduct must have caused the defendant's confession. *Connelly, supra,* at 164.

{¶ 75} To determine voluntariness, the court must look at the totality of the circumstances surrounding the statement and consider such factors as the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement. *State v. Edwards* (1976), 49 Ohio St.2d 31, 358 N.E.2d 1051, at paragraph two of the syllabus. The question of whether a statement is voluntary is a question of law which we review de novo. *State v. Patterson*, Montgomery App. No. 20977, 2006-Ohio-1422, at ¶ 22.

{¶ 76} Similarly, a suspect may waive his *Miranda* rights only if that waiver is done knowingly, intelligently, and voluntarily. *State v. Myers*, Drake App. No. 1643, 2006-Ohio-1604, at ¶ 65. Whether or not a suspect voluntarily waives his *Miranda* rights is based on the totality of the circumstances. *State v. Clark* (1988), 38 Ohio St.3d 252, 261, 527 N.E.2d 844. To determine the voluntariness of a defendant's waiver, the court should consider the following: (1) the age, mentality and prior criminal experience of the defendant; (2) the length and intensity of the interrogation; and (3) the existence of physical mistreatment, threat or inducement by government officials. *State v. Brewer* (1990), 48 Ohio St.3d 50, 58, 549 N.E.2d 491, *citing Edwards*, paragraph two of the syllabus, vacated as to death penalty, *Edwards v. State* (1978), 438 U.S. 911, 98 S.Ct. 3147, 57 L.Ed.2d 1155. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the

consequences of the decision to abandon it. *Dailey, supra*, at 91.

{¶ 77} Further, if a suspect requests counsel, all interrogation must cease until an attorney is present or the suspect himself initiates communication. *Edwards v. Arizona* (1981), 451 U.S. 477, 481, 101 S.Ct. 1880, 68 L.Ed.2d 378; *State v. Henness* (1997), 79 Ohio St.3d 53, 63, 679 N.E.2d 686. To invoke the right to counsel, a suspect must make a request with enough clarity that "a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Davis v. United States* (1994), 512 U.S. 452, 459, 114 S.Ct. 2350, 129 L.Ed.2d 362; *Henness*, at 63, 679 N.E.2d 686. If the request is ambiguous or equivocal, the police may continue to question the suspect; they need not stop the interrogation to clarify whether the suspect actually invoked his right to counsel. *Davis, supra*, at 461-462; *State v. Jackson*, 107 Ohio St.3d 300, 839 N.E.2d 362, 2006-Ohio-1, at ¶ 93.

{¶ 78} We have reviewed State's Exhibit 2, as well as the transcript of the suppression hearing, and we find that appellant's statements were not obtained in violation of his Fifth Amendment rights. Appellant's recorded interview on March 12, 2006, lasted approximately two hours, and began with Detective Phillips informing appellant that he was being interviewed because the state was investigating additional charges,FN6 but that appellant did not have to talk if he did not want to. For approximately the next 18 minutes, appellant initiated and sustained most of the conversation. During this time, appellant referenced the attorney that had been appointed to him at his municipal court arraignment, but at no time did he expressly request that she be present.

FN6. Detective Phillips conveyed to appellant the nature of the additional charges.

{¶ 79} When Detective Phillips informed appellant that he would like to read him his rights so that he could ask appellant some questions, appellant became somewhat agitated. Appellant stated that he had been talking to Detective Phillips "voluntarily," but that reading him his rights "sounded a little different" and would be "turning this into" something else; appellant explained that "every time" he had been read his rights he was in "trouble," either being "charged with something or arrested." State's Exhibit 2. Detective Phillips again explained that he could not ask appellant any

41

questions until he had been read his rights and told appellant that if he was uncomfortable proceeding without first talking to his attorney, then he would terminate the interview. Detective Phillips offered to contact appellant's attorney in order to set up another interview, along with the caveat that attorneys, "more than nine times out of ten will not let [the police] talk to anybody and that is not always in the best interest of the person who is being investigated." *Id*. Appellant again espoused his theory of the case, which was that A.S. was abusing drugs and using her contacts in the police department to harass him, and expressed his desire for the "truth to come out." *Id*. Detective Phillips explained to appellant that another interview should be set up sooner as opposed to later, as a decision on whether to charge appellant with additional offenses needed to be made. After a few moments of further discussion, appellant told Detective Phillips that he would talk "now." *Id*. He reiterated his desire for the "truth to come out," and told Detective Phillips that he had a "good feeling about [him]." *Id*. At that point, Detective Phillips read appellant his Miranda rights, which appellant said he understood. Detective Phillips interviewed appellant for the next hour and a half, and, much like the first 20 minutes of their encounter, appellant carried the conversation.

{¶ 80} In this case, it should first be noted that appellant does not allege intimidation, coercion, or deception, nor does our review of the record disclose that appellant waived his rights because his "will was overborne" or that "his capacity for self-determination was critically impaired because of coercive police conduct." *State v. Nields* (2001), 93 Ohio St.3d 6, 14, 752 N.E.2d 859; *see, also State v. Gapen*, 104 Ohio St.3d 358, 2004-Ohio-654, at ¶ 53. Although appellant was not read his *Miranda* rights until approximately 25 minutes into the interview, the majority of that conversation was initiated and sustained by appellant, who clearly "evinced a willingness and a desire" to talk. *Id*. In fact, appellant described the statements he made during that time as having been made "voluntarily." State's Exhibit 2. Additionally, when Detective Phillips told appellant that he was going to terminate the interview because appellant appeared to be uncomfortable with having his rights read to him, appellant indicated that he wished to waive those rights and "talk now," and that he had a "good feeling" about him. State's Exhibit 2. After appellant was read his rights, he acknowledged that he understood such rights, and then proceeded

to give statements for the next hour and a half. During the interview, Detective Phillips attempted to wrap up the interview several times, but appellant repeatedly reopened dialogue. Appellant's verbal assent to waive his rights and his actions in speaking with Detective Phillips indicate that he voluntarily waived his rights.

{¶ 81} The totality of the circumstances buttresses that determination. Appellant was 35-years old when he was interviewed, and denied having any mental illness or being under the influence of any substances. In fact, appellant described himself as having "good sense," and stated that he had received "straight A's" in school. State's Exhibit 2. Appellant expressed familiarity with his *Miranda* rights, and has what may be considered an extensive criminal history. Indeed, it is clear from the interview that the source of appellant's apprehension about having his *Miranda* rights read to him stemmed from the fact that "every time" he had had his rights read to him in the past, he was in "trouble," or was being "charged with something or arrested." State's Exhibit 2.

{¶ 82} We also note that the record does not support appellant's contention that he articulated a desire to have counsel present during the interview. Although appellant stated that he had been appointed counsel, he did not express a desire to have that attorney, or any other attorney, to be present to represent him at the time. Further, even if appellant had invoked his right to counsel, he subsequently initiated further communication with Detective Phillips, and, therefore, waived his constitutional rights. *Edwards*, supra, at 484-485 ("[A]n accused[,] * * * having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.").

 {¶ 83} Furthermore, to the extent appellant is arguing that any statements given to Detective Phillips prior to being advised of his Miranda rights tainted any statements made after having been so advised, this argument is without merit. *Miranda, supra*, at 478. In *Oregon v. Elstad* (1985), 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222, the United States Supreme Court held that a failure to administer *Miranda* warnings does not unduly taint the investigative process to render a subsequent voluntary and informed waiver ineffective.

43

This court has held "the central holding in the *Elstad* case is that the Self-Incrimination Clause of the Fifth Amendment does not require the suppression of a confession, made after proper *Miranda* warnings and a valid waiver of rights, solely because the police had obtained an earlier voluntary but unwarned admission from the suspect." *State v. Finfrock*, Franklin App. No. 02AP-1006, 2003-Ohio-1661; *see, also, In re Hill*, Franklin App. No. 03AP-82, 2003-Ohio-6185, at ¶ 13. Since we have already determined that appellant's waiver was voluntary and informed, we find appellant's argument to the contrary is without merit.

{¶ 84} To summarize our discussion, appellant described his pre-*Miranda* warning statements as having been made voluntarily, and, when appellant was read his rights, he acknowledged that he understood those rights, which he then chose to waive by speaking with Detective Phillips. Additionally, appellant failed to allege or otherwise indicate how his statements were rendered involuntary by police coercion. Thus, we find that appellant's statements and waiver of rights were voluntary, and appellant's motion to suppress those statements was properly denied.

...

{¶ 86} Accordingly, we overrule appellant's sixth assignment of error.

Again, upon review of the record the Court is not persuaded that the factual findings warrant federal habeas review.  28 U.S.C. §2254(d)(e).  The State court's decision is generally consistent with the governing principles applied in determining whether a voluntary waiver of a defendant's *Miranda* rights  has occurred.  The totality of the circumstances surrounding petitioner's interrogation indicate his level of comprehension of the nature of the interview and the voluntariness of his waiver of his rights.   As with his other claims, petitioner has presented nothing to the contrary, choosing instead simply to rely on the same argument rejected by the state appellate

court.

There might be some colorable issue here if any of petitioner's statements made during the first portion of his conversation with Detective Phillips were not repeated after he waived his rights or were more prejudicial than statements he made later. *Miranda* is, after all, designed to be a "bright-line" rule, and the failure to give all of the required warnings is a violation of that rule.  *See Arizona v. Roberson*, 486 U.S. 675 (1988); *see also Dickerson v. United States*, 530 U.S. 428 (2000).  However, the Court agrees that, on this record, petitioner was not harmed by the admission of any statements he made (if, in fact, any of them were admitted) prior to the administering of the full set of *Miranda* warnings.  Consequently, petitioner's fourth claim is without merit.

## C. CLAIM FIVE

Petitioner's final claim is that he was denied his right to the effective assistance of appellate counsel.  In his memorandum in support of his petition, petitioner claims that appellate counsel was ineffective because he  failed to raise on direct appeal the issue of prosecutorial misconduct as it related to the victim's testimony and statements made in closing argument and because he failed to raise the issue of the ineffective assistance of trial counsel.

The *Strickland* test applies to appellate counsel. *Burger v. Kemp*, 483 U.S. 776 (1987).  Counsel must provide reasonable professional judgment in presenting the appeal. *Evitts v. Lucey,* 469 U.S. 387, 396-97 (1985). " '[W]innowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being

evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983)); *see also Mapes v. Coyle*, 171 F.3d 408, 427-28 (6th Cir. 1999)(outlining factors to consider in assessing a claim of ineffective assistance of appellate counsel).  However, "[d]efense counsel has no obligation to raise every issue argued by the defendant or to raise frivolous issues on appeal."  *Neeley v. United States*, 2008 WL 2558013 (E.D. Tenn. June 23, 2008).  No decision of the United States Supreme Court

> suggests... that the indigent defendant has a constitutional right to compel appointed counsel to press nonfrivolous points requested by the client, if counsel, as a matter of professional judgment, decides not to present those points.

*Jones v. Barnes*, 463 U.S. 745, 751 (1983); *see also McFarland v. Yukins*, 356 F.3d 668, 710 (6th Cir. 2004)("the decision of which among possible claims to pursue is ordinarily entrusted to counsel's professional judgment.")

Petitioner raised this claim in his application for reopening before the state appellate court.  That court held:

> {¶6} Appellant's assignments of error can be broken down into two arguments: his appellate counsel failed to raise the issue of prosecutorial misconduct and failed to argue ineffectiveness of trial counsel.
>
> {¶7} Appellant's first argument centers on his belief that appellate counsel was ineffective for failing to include prosecutorial misconduct as a basis for the original appeal.  Specifically, appellant asserts that the prosecutor: (1) knowingly allowed the victim to testify to statements that were inconsistent with statements that she previously gave to the investigating officer; and (2) made statements during closing arguments that improperly vouched for the credibility of the state's witnesses and disparaged

the appellant.

{¶8} The test used to determine the existence of prosecutorial misconduct is whether the challenged conduct or comments of counsel are improper and, if so, whether they prejudicially affect substantial rights of the defendant.  *State v. Smith* (2000), 87 Ohio St.3d 424, 442.  "The touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor."  *Smith v. Phillips* (1982), 455 U.S. 209, 219, 102 S.Ct. 940.  As such, misconduct is not grounds for reversal unless it is shown that the defendant has been denied a fair trial. *State v. Maurer* (1984), 15 Ohio St.3d 239, 266.

{¶9} Further, prosecutors are afforded wide latitude in closing arguments.  *State v. Jacks* (1989), 63 Ohio App.3d 200, 210.  The arguments must be reviewed in their entirety to determine whether the prosecutor's disputed remarks were prejudicial.  *State v. Mann* (1993), 93 Ohio App.3d 301, 312.  For a prosecutor's closing argument to be prejudicial, the remarks must be "so inflammatory as to render the jury's decision a product solely of passion and prejudice."  *State v. Williams* (1986), 23 Ohio St.3d 16, 20.  Even if a prosecutor's statements during closing arguments are improper, reversal based upon those statements is warranted only if the statements permeate the entire atmosphere of the trial. *State v. Tumbleson* (1995), 105 Ohio App.3d 693, 699.

{¶10} With respect to appellant's argument concerning the victim's alleged inconsistent statements, appellant does not identify those statements, and further fails to explain how those alleged statements impacted his trial.  This argument also raises matters outside the record that are not the proper subject of this application.  Appellant's argument regarding the statements made by the prosecutor during closing argument fares no better.  After reviewing each statement, we cannot find that any of the same constituted prosecutorial misconduct and prevented appellant from receiving a fair trial.

{¶11} The gravamen of appellant's second assignment of error is that appellate counsel was ineffective for failing to raise on appeal whether he received ineffective assistance of trial counsel. Specifically, appellant claims that his trial counsel was ineffective for failing to : (1) interview witnesses that he claims would have

47

exonerated him; (2) investigate the crime scene by testing the walls and carpet for blood and semen; (3) interview the victim's neighbors; (4) procure medical expert testimony to refute the testimony of Dr. Daniel G. Jackson; (5) obtain an independent expert to analyze the victim's hair; (6) challenge the chain of custody regarding the victim's hair analysis; (7) object to and cross-examine the victim about her alleged inconsistent statements; and (8) object to the prosecutor's remarks during closing argument.

{¶12} We can quickly dispense with the last two alleged deficient acts set forth above.  As we previously mentioned, appellant has failed to identify the victim's statements that he claims are inconsistent.  And, we have already determined that the prosecutor's remarks during closing argument did not constitute misconduct.  Thus, appellate counsel was not deficient in failing to assign error to trial counsel's failure to object.

{¶13} Regarding appellant's remaining arguments, when allegations of ineffective assistance of counsel hinge on facts not appearing in the record, the proper remedy is a petition for post-conviction relief rather than a direct appeal.  *State v. Cooperrider* (1983), 4 Ohio St.3d 226, 228; *State v. White* (Nov. 2, 1999), Franklin App. No. 98AP-1379.  Here, even if appellant was able to demonstrate that his trial counsel's investigation was deficient, determination of appellant's claim of ineffective assistance of trial counsel would require evidence outside the record to assess whether counsel's inactions prejudiced appellant.  The record contains no indication that the potential witnesses, whom appellant has failed to identify, could have been located, nor does the record provide any indication as to what the testimony from these witnesses would have been.  Similarly, there is nothing in the record to suggest that an independent examination of the crime scene or analysis of the victim's hair strand would have yielded results different from that which is contained in the record.  Accordingly, appellant's proposed claims that his trial counsel was ineffective in preparing for trial and investigating his defense would not have properly been before this court for determination on direct appeal.  Thus, we find no deficiency in appellate counsel's failure to make such arguments.

{¶14} Nor do we find that appellate counsel was ineffective for failing to assign as error trial counsel's failure to call a medical

48

> expert to refute the testimony of Dr. Jackson, who treated the victim when she sought medical treatment for her perforated eardrum.  In addition to the fact this argument involves facts not appearing in the record, we note that appellant's trial counsel cross-examined Dr. Jackson regarding his treatment of the victim, and there is no suggestion by appellant that this performance was deficient.  Thus, appellate counsel was not deficient in failing to raise this issue.

*Exhibit 20 to Return of Writ*, pp. 4-7.

As with petitioner's other claims, the Court of Appeals decision with respect to this claim was not an unreasonable application of clearly established federal law to the facts.  Petitioner has not provided any argument to persuade the Court otherwise.  The petitioner has simply relied on the same argument considered and appropriately rejected by the state appellate court.   The record simply does not support the conclusion that the claims petitioner asserts should have been raised on appeal were potentially meritorious.  Under this circumstance, the  petitioner has failed to demonstrate that his appellate counsel was ineffective for failing to raise them on appeal.  Further, appellate counsel cannot possibly be deemed ineffective for failing to raise on direct appeal any off the record claims of ineffective assistance of trial counsel.  In Ohio, off-the-record claims are properly raised in post conviction proceedings and not on direct appeal.  *See* O.R.C. 2953.21; *Hammond v. Sheets,* 2010 WL 4279124, *10 (S.D. Ohio Oct. 21, 2010).   Consequently, petitioner's fifth claim is without merit.

### RECOMMENDED DISPOSITION

For all the foregoing reasons, the Magistrate Judge **RECOMMENDS** that petitioner's claims be **DISMISSED.**

## PROCEDURE ON OBJECTIONS

If any party objects to this *Report and Recommendation*, that party may, within fourteen (14) days of the date of this report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the *Report and Recommendation* will result in a waiver of the right to have the district judge review the *Report and Recommendation de novo*, and also operates as a waiver of the right to appeal, the decision of the District Court adopting the *Report and Recommendation. See Thomas v. Arn*, 474 U.S. 140 (1985);*United States v. Walters*, 638 F.2d 947 (6th Cir.1981).

The parties are further advised that, if they intend to file an appeal of any adverse decision, they may submit arguments in any objections filed, regarding whether a certificate of appealability should issue.

/s/ Terence P. Kemp
United States Magistrate Judge